IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

LEROY CALVIN HALL, )
)
    Plaintiff, )
)
VS. ) CASE NO. _____
) JURY DEMAND
CHRISTIAN EDUCATION, INC., d/b/a )
EZELL-HARDING CHRISTIAN SCHOOL, )
)
    Defendant. )

## COMPLAINT

### JURISDICTION AND VENUE:

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-5(f)3.

2. Venue is proper in the Middle District of Tennessee, pursuant to 28 U.S.C. §1391(b)(1) and (2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

### THE PARTIES:

3. Plaintiff has been a resident of Davidson County at times relevant to this complaint.

4. Defendant Christian Education, Inc., d/b/a Ezell-Harding Christian School has been a non-profit Tennessee corporation that has operated a kindergarten through twelfth grade school in Davidson County at times relevant to this complaint.

1

## EXHAUSTION OF ADMINISTRATIVE REMEDIES:

5. Plaintiff filed a pro se Charge of Discrimination with the Tennessee Human Rights Commission and EEOC on or about January 23, 2014, in which he asserted discrimination claims based on race, sex and retaliation. A supplemental Charge of Discrimination was filed on or about March 6, 2014, reiterating his discrimination claims based on race, sex and retaliation. On March 18, 2015, the United States Equal Employment Opportunity Commission issued a notice of suit rights with reference to Plaintiff's claims.

## STATEMENT OF FACTS:

6. Plaintiff was hired by Defendant in February of 2012 to begin employment as a high school teacher and head football coach.

7. Defendant terminated Plaintiff's employment on December 20, 2013.

8. Plaintiff, whose date of birth is December 11, 1975, is an African-American.

9. At the time Plaintiff was hired by Defendant in February of 2012, he was a high school teacher and an assistant football coach at LaVergne High School. He was the first African-American to ever be hired by Defendant to be a faculty member or a full-time football coach.

10. Defendant employed 106 employees during the time period relevant to this litigation. All of the faculty members, except Plaintiff and Reggie Grimes, were Caucasian except for perhaps one Asian-American elementary school teacher.

11. Approximately two years before Plaintiff was hired by Defendant, he had interviewed with Defendant for a teaching/head coaching job, but was not hired.

12. Following Plaintiff's interview and the hiring of a Caucasian to be Defendant's head football coach in 2010, Defendant's either then or previous board member, Don Jenkins,

2

called Plaintiff to apologize for his not being hired and told him he thought he should have gotten the job.

13. At the time Plaintiff interviewed in 2010, Don Prudenthal was Defendant's Athletic Director. During calendar year 2013, but prior to December 16, 2013, Prudenthal told Plaintiff there was no way he was going to get the job in 2010, and that the school President had forced him to post the job and interview Plaintiff.

14. In January of 2012, Plaintiff received a call from Defendant's then school President, Beecher Frasier. Mr. Frasier told Plaintiff he wanted the school faculty at Ezell-Harding to be more racially diverse and inclusive. At that time, the student population was approximately 60% Caucasian and 40% minority. Mr. Frasier told Plaintiff the school faculty needed to be more reflective of the student population. Mr. Frasier told Plaintiff he had gotten his name from Don Jenkins and Ralph Mitchell who were either then members of Defendant's Board of Directors or had been previously.

15. Upon reaching an agreement for Plaintiff to become employed by the Defendant, Mr. Frasier introduced him first to the entire middle school and faculty and then to the high school faculty. Mr. Frasier said to each group: "As you can see, Coach Hall is an African-American. This is an example of how we are changing things here. We will have diversity at Ezell-Harding." These statements were made by Mr. Frasier in approximately March of 2012.

16. Plaintiff actually began working for Defendant on a part-time basis in February of 2012, before beginning work full-time on June 1, 2012.

17. Upon Plaintiff's recommendation, Mr. Frasier also hired Plaintiff's former Alabama football teammate, and fellow African-American, Reggie Grimes to work as an Assistant football coach and Director of Admissions.

3

18. Plaintiff and Reggie Grimes were the first African-American faculty members ever hired by Defendant.

19. On information and belief, Plaintiff submits that Defendant's school came into existence in approximately 1972.

20. During the 2012-2013 school year, Plaintiff was the head coach of Defendant's high school football team. He also taught senior math and weight lifting. For the portion of that school year beginning in January of 2013, he additionally taught three personal finance classes.

21. The football team Plaintiff coached in 2012 reached the play-offs which was also the first time in eight years that the school had hosted a play-off game.

22. Beecher Frasier resigned as Defendant's school President in the spring of 2013.

23. Within approximately one month of Mr. Frasier's resignation, Reggie Grimes was demoted from Director of Admissions to teaching middle school physical education.

24. School Principal Belvia Pruitt advised Plaintiff that Grimes had been transferred from the classroom to physical education because with his degree, it was more suitable for him to teach physical education.

25. John Sullivan is a Caucasian. He was Defendant's Vice-President of School Affairs and was placed in charge of admissions after Reggie Grimes was demoted. Grimes was then placed in the same office with Plaintiff which was not even in the middle school where Grimes was assigned following his demotion. Thus, Defendant placed its only African-American faculty members in the same small office. They were the only two coaches who had to share an office.

26. On approximately July 1, 2013, Ronnie Rummage was promoted by Defendant to the position of school President. He had been employed by Defendant for approximately 34 years. He is Caucasian.

27. On July 8, 2013, Plaintiff completed and signed a survey sent by Defendant's representative(s) asking for ideas for improvements at the school. On the survey, Plaintiff stated that Defendant should improve race relations and explained his answer by stating: "We need more diversity on our staff. I understand that some may not embrace diversity, but our staff does reflect our our (sic) student body at all."

28. On approximately July 25, 2013, Plaintiff spoke with then-President Rummage and Defendant's Vice-President John Sullivan. Rummage told Plaintiff, with reference to his survey statements, that talk about discrimination is divisive, and he asked Plaintiff why he brought up race as a topic. Plaintiff replied that this is the best time and place to talk about necessary racial changes because they were alone in the building at the time.

29. On December 16, 2013, Plaintiff was teaching his health class and was walking to the gymnasium to speak to School Principal Belvia Pruitt. A student approached Plaintiff and confronted him about Plaintiff's giving the class a final examination. Plaintiff confirmed to the student that there would be a test. The student expressed his displeasure at having to take a written test administered by Plaintiff.

30. Before Plaintiff was ever touched by the student, he called Ms. Pruitt by name in an effort to get her assistance with the unruly student. She stopped, then turned away and walked into her office.

31. After Plaintiff asked the student to be quiet and calm down, the student pushed Plaintiff, causing him to spill some coffee he was holding in a cup. The student then began

5

walking down a hall away from Plaintiff. Plaintiff set his coffee down on a water fountain and followed the student, advising him that they were going to the office. The student responded by pushing Plaintiff again. Plaintiff responded by appropriately restraining the student's hands to prevent the student from hitting him again. He moved the student to the side of the hall and began telling the student to calm down. The student told Plaintiff: "Get your damn hands off me". Plaintiff replied by telling the young man that when he calmed down, he would let him go. Then the student pushed Plaintiff a third time.

32. Defendant had no written policy that prohibited physical contact between students and teachers, nor did the Defendant have a written policy requiring teachers to immediately leave the scene of an altercation caused by a student.

33. The actions Plaintiff took with the unruly student did not violate any written policy of the Defendant and were not excessive in any way.

34. The assault perpetrated on Plaintiff by the unruly student began approximately 60 seconds after Ms. Pruitt walked away following Plaintiff's calling her name.

35. Prior to appropriately dealing with the unruly student on December 16, 2013, Plaintiff had never received disciplinary action of any kind from Defendant.

36. Mr. Rummage called Plaintiff on December 16, 2013, and told him to come to the school for a meeting. The meeting took place on December 20, 2013. Defendant's representatives who were present were Assistant Athletic Director Brady Farmer, School Principal Belvia Pruitt, Athletic Director Don Prudenthal, School President Ronald G. Rummage and School Vice-President John Sullivan. Plaintiff was told that he had acted inappropriately with reference to the handling of the young man in his health class on December 16, 2013, and

6

that he had used excessive discipline. Plaintiff was told by Rummage he could either resign or be fired. Plaintiff refused to resign because he had done nothing wrong.

37. During the meeting, Rummage told Plaintiff that some of the school's directors had seen the videotape of the December 16, 2013, incident and they had decided it was in the school's best interest for Plaintiff not to be retained.

38. Defendant then terminated Plaintiff.

39. Defendant, through President Ronald G. Rummage, maintains Plaintiff was terminated for use of inappropriate discipline "by a professional educator."

40. Plaintiff is approximately 6'3" tall and weighs approximately 235 pounds. The student who assaulted him weighs about 150 pounds. At no point did Plaintiff strike or curse the student. The student was not injured.

41. At times relevant to this litigation, Defendant employed a Caucasian woman believed to be known as "Ms. Chamberlain" as an elementary school teacher. On information and belief, Plaintiff submits that Ms. Chamberlain placed her hands forcefully on a student to move him to where she wanted him to be. The child was injured in a non-serious way by her actions.

42. On information and belief, Plaintiff submits there was a complaint about Ms. Chamberlain's discipline of the student, but she was not terminated by Defendant.

43. Ms. Chamberlain is a Caucasian female.

44. Reggie Grimes was not allowed to coach after Plaintiff's termination.

45. Reggie Grimes was advised at the end of the 2013-2014 school year he was not being retained. Thus, the first two African-American teachers ever hired by Defendant were both terminated.

7

Case 3:15-cv-00648   Document 1   Filed 06/11/15   Page 7 of 11 PageID #: 7

46. Plaintiff was replaced as head football coach by a Caucasian.

47. Plaintiff was qualified to perform all of the duties in his positions as Defendant's high school head football coach and as a teacher, and he fully performed his job satisfactorily.

48. Plaintiff is currently employed as a teacher and head football coach at Antioch High School.

49. Attached hereto as Exhibit A is a copy of a letter dated January 6, 2014, by Defendant's Athletic Director Don Prudenthal, which is a letter of recommendation for Plaintiff.

50. On December 20, 2013, the date Plaintiff was terminated, Prudenthal told him "this was not football related. I had nothing to do with it. As far as I'm concerned, you did an excellent job with what you had." He also told Plaintiff to use him as a reference for future employment.

51. Plaintiff has suffered lost wages and the loss of employment benefits due to his termination.

52. Plaintiff has also experienced substantial humiliation, embarrassment and mental anguish due to his termination by Defendant.

53. On page 16 of Defendant's Faculty & Staff Handbook that was operative as of December 16, 2013, the following paragraph under the heading of "Workplace Violence" is stated:

> An employee who believes that he/she has been subjected to threatening or intimidating workplace behavior, or who observes such behavior in the workplace, should report such conduct immediately to his/her supervisor, his/her Principal, Security, or the President.

54. Plaintiff complied with the policy referenced in the preceding paragraph when he called Ms. Pruitt's name. Without saying or asking anything, or approaching Plaintiff and the

8

Case 3:15-cv-00648   Document 1   Filed 06/11/15   Page 8 of 11 PageID #: 8

unruly student, she walked away, thereby leaving Plaintiff to deal with the student the best he could.

55. Defendant had a written policy provided to faculty members entitled "100 Discipline & Classroom Management Tips" that was operative as of December 16, 2013. The following "tips" were included:

   a. 41. Let students know you are in control of the class at all times;

   b. 58. Get assistance of counselors and other specialists when needed;

   c. 84. Try to direct matters so that students make the right decisions, but if they do not, it is your responsibility to set them right. Remember your role as an adult leader. They may resist at times, but they expect leadership from you.

   d. 100. Use the LEAST approach to discipline first.

56. Plaintiff satisfied and fully complied with each policy referenced in paragraph 55.

## FIRST CAUSE OF ACTION:
## RACE DISCRIMINATION IN VIOLATION OF TITLE VII:

57. Plaintiff re-alleges and incorporates by reference each and every allegation contained in all previous paragraphs.

58. Defendant utilized employment customs, practices and policies that had a significant and disparate adverse impact on him, Reggie Grimes, and any other African Americans who may have sought employment from Defendant. Plaintiff's termination was directly and proximately caused by the disparate impact of Defendant's racially unlawful customs, practices and policies.

59. Defendant's termination of Plaintiff resulted in his receiving less favorable treatment than similarly situated Caucasian teachers and coaches, and thus, he was the victim of disparate treatment based upon his race.

9

60. Defendant's termination of Plaintiff violated Title VII at 42 U.S.C. §2000e-2(a)(1) and (2).

61. Defendant's violation of Title VII injured and damaged Plaintiff.

62. By reason of Defendant's racially and discriminatory unlawful actions toward Plaintiff, he is entitled to all legal and equitable remedies provided by Title VII. Specifically, he is entitled to back pay and the value of lost employment benefits, plus interest, front pay, along with damages for humiliation, embarrassment and mental anguish, plus attorney's fees, witness fees, other litigation expenses, liquidated and punitive damages.

63. With reference to Defendant's termination of Plaintiff, Defendant engaged in discriminatory practices with malice or reckless indifference to Plaintiff's federally protected rights in violation of 42 U.S.C. §1981a(b)(1).

64. Defendant's termination of Plaintiff constituted an adverse employment action.

## SECOND CAUSE OF ACTION:
## RETALIATION IN VIOLATION OF TITLE VII:

65. Plaintiff re-alleges and incorporates by reference each and every allegation contained in all previous paragraphs.

66. Plaintiff engaged in Title VII protected activity when he addressed racial discrimination and lack of diversity in the July 2013 survey to which he signed his name.

67. Defendant retaliated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e)3(a) et seq., as amended.

68. Defendant retaliated against Plaintiff by terminating him because he had opposed Defendant's failure to reasonably consider, hire, and retain minority African-American faculty members based upon their race and skin color.

10

Case 3:15-cv-00648   Document 1   Filed 06/11/15   Page 10 of 11 PageID #: 10

69. Plaintiff's engaging in Title VII protected activity is the sole reason for his termination by Defendant.

70. Alternatively, Plaintiff submits that his engaging in protected activity was the "but for" cause of his termination.

71. By reason of Defendant's discriminatory, unlawful and retaliatory actions toward Plaintiff, he is entitled to all legal and equitable remedies available pursuant to Title VII, including, but not limited to, back pay and the value of lost employment benefits, plus interest thereon, damages for humiliation, embarrassment and mental anguish, liquidated damages, punitive damages, front pay, attorney's fees, witness fees and other litigation expenses.

Respectfully submitted,

R. STEVEN WALDRON, BPR #2767
BENJAMIN L. PARSLEY, III, BPR #26888
Attorneys for Plaintiff
WALDRON, FANN & PARSLEY
202 W. Main Street
Murfreesboro, TN 37130
(615) 890-7365; fax (615) 848-1658
e-mail: arlenesmith@comcast.net